# In the United States Court of Federal Claims

Case Nos. 13-584 C, 13-585 C, 13-586 C
(**Filed UNDER SEAL** March 25, 2016)
**REISSUED** April 7, 2016

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Spent Nuclear Fuel Storage Cost; |
| v. | ) | Breach of Contract Damages; Cost of |
| | ) | Corporation Existence; Termination of |
| THE UNITED STATES, | ) | Benefit Programs Costs; Property |
| Defendant, | ) | Transfer Costs. |

| | |
|---|---|
| MAINE YANKEE ATOMIC POWER COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| Defendant, | ) |

| | |
|---|---|
| CONNECTICUT YANKEE ATOMIC POWER COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

*Robert H. Stier, Jr.*, Pierce Atwood LLP, Portland, Maine, for plaintiffs. *Lucus A. Ritchie* and *Eric J. Wycoff*, Pierce Atwood LLP, Portland, Maine, of counsel.

*Lisa L. Donahue*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom appeared *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*,

Director, *Allison Kidd-Miller*, Assistant Director, for defendant.  *Kristin B. McGrory* and *Heidi L. Osterhout*, Trial Attorneys.  *Jane K. Taylor*, Office of General Counsel, United States Department of Energy, Washington, D.C., of counsel.

## OPINION

**Merow**, *Senior Judge*

Yankee Atomic Electric Company ("Yankee Atomic"), Maine Yankee Atomic Power Company ("Maine Yankee"), and Connecticut Yankee Atomic Power Company ("Connecticut Yankee") (collectively "plaintiffs"), filed complaints on August 16, 2013, alleging the government's breach of its contractual obligations related to the removal of spent nuclear fuel ("SNF") from plaintiffs' facilities.  *See* Case No. 1:13-cv-584, Doc. 1; Case No. 1:13-cv-585, Doc. 1; Case No. 1:13-cv-586, Doc. 1. The three cases have been consolidated for trial.[1]

This is the third round of litigation as a result of the government's continuing breach of the same agreements.  In the first set of cases, the government's liability was established.  *See Yankee Atomic Elec. Co. v. United States,* 73 Fed. Cl. 249 (2006).  The parties, however, continue to disagree as to the damages each plaintiff is entitled to recover.  Plaintiffs now seek damages in an amount of approximately $77.9 million, for costs incurred as a result of the government's breach between January 1, 2009 and December 31, 2012. *See* Doc. 39 at 6.

To resolve the dispute, trial was held on June 30 through July 1, 2015. Following the submission of post-trial briefs, supplemental briefing was ordered to clarify part of the legal framework for plaintiffs' claims relating to costs associated with administration of health and welfare benefits programs.  *See* Doc. 44.  Final oral argument was held on Friday, February 19, 2016.

## FINDINGS OF FACT

The government entered into nearly identical Standard Contracts with each of the utilities in this case, under which the government, through the Department of Energy ("DOE"), agreed to dispose of the utilities' SNF.[2]  At the time of trial, all

---

[1] Because the cases often involve identical filings, unless otherwise noted, citations to the docket refer to documents filed in Case No. 1:13-cv-584.

[2] In *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249 (2006), the court wrote extensively on the contracts between the utilities and the government and on the historical context in which

three utilities had been shut down, and currently each maintains its corporate existence only due to the SNF stored at the sites as a result of the government's breach of its obligations to dispose of it. *See* Tr. at 16:18-17:8 (Norton). As a result of this "steady-state" existence, plaintiffs' claim:

> [*A*]*ll* costs reasonably incurred by each Yankee to maintain its corporate existence following the completion of decommissioning of its power plant are related to the management of SNF/GTCC, and are recoverable unless those costs would have also been incurred in the non-breach world. After the date when the company would have gone out of business in the non-breach world, there should be no set-off to the costs actually incurred.

Doc. 39 at 6-7 (emphasis in original).

At the direction of the court, the parties have cooperated in an extensive audit process, through which they evaluated the specific costs included in plaintiffs' damages claim. *See* Docs. 12, 13. Although the government contends that plaintiffs should recover none of the claimed damages for failure to establish a sufficient non-breach world model, *see* Doc. 42 at 19-20, the government specifically objects only to the following categories of damages: (1) the costs to plaintiffs of administering their health and welfare plans, (2) the distribution of settlement proceeds from the Stone & Webster Engineering Corporation ("SWEC") litigation, (3) costs associated with transfer of the property on which the nuclear plants were situated, and (4) the legal and tax expenses related to the recovery of damages from the first round of this litigation. The following facts are relevant to resolving these issues.

## I.    Plaintiffs' Calculation of Damages

Each utility arrived at its amount of claimed damages by calculating the actual costs incurred as a result of the government's breach, less the costs that the utility would have incurred in the non-breach world. *See* Tr. at 83:16-84:4 (Smith). The starting point for these calculations are the storage facility costs, or "ISFSI Operational Costs" for each utility during the claim period. *See* Doc. 39 at 11; Tr. at 91:21-92:3 (Smith). The operational costs include: full and part-time employees, security costs, contracted labor for temporary or special projects, taxes, insurance, utility costs, materials and supplies, and other miscellaneous expenses. *See* Tr. at

---

the contracts came about. In the interest of focusing on the new issues before the court, the discussion is not repeated in this opinion.

17:9-21:14 (Norton). These costs were not only deemed reasonable by plaintiffs' own witness, *see* Tr. at 24:20-26:18 (Norton), but were also reviewed and allowed by the Federal Energy Regulatory Commission ("FERC"), *see* Tr. at 99:11-19 (Smith). The specific figures are presented in Exhibits P3004A, P3005A, and P3006A, each of which is accompanied by supporting details derived from the utilities' accounting system, invoices, purchase orders, and payroll information. *See* Tr. at 95:7-95:18 (Smith).

For Connecticut Yankee and Yankee Atomic, the damages calculation includes offsets for the utilities' corporate existence into the instant claims period. *See* Ex. P3004A, Ex. P3006A; Tr. at 92:23-93:24 (Smith). Absent the government's breach, plaintiffs contend, Connecticut Yankee and Yankee Atomic would have been out of business by the end of 2010. *See* Tr. at 37:14-16 (Norton). No such offset is included in Maine Yankee's calculation of damages because in the non-breach world, it allegedly would have been out of business at the end of 2008. *See* Tr. at 29:1-2 (Norton); 122:7-124:5 (Smith).

Finally, all three utilities include "agreed-to-reductions" in the damages calculus. Through the audit process, the parties agreed to the modification of certain costs in the government's favor. *See* Tr. at 92:6-20 (Smith).

In accordance with this methodology, the specific figures for each plaintiff are as follows:

### Connecticut Yankee
| | |
|---|---|
| ISFSI Operational Costs: | $36,585,702 |
| Offset for Minimal Corporate Continuation: | ($2,213,299) |
| Agreed-to Reductions: | ($1,444,809) |
| Total: | $32,927,594 |

### Maine Yankee
| | |
|---|---|
| ISFSI Operational Costs: | $25,278,882 |
| Agreed-to Reductions: | ($239,083) |
| Total: | $25,039,799 |

### Yankee Atomic
| | |
|---|---|
| ISFSI Operational Costs: | $22,841,715 |
| Offset for Minimal Corporate Continuation: | ($1,669,886) |
| Agreed-to Reductions: | ($1,235,177) |
| Total: | $19,936,652 |

*See* Doc. 39 at 13-14; Exs. P3004A, P3004B, P3004C (Connecticut Yankee); P3005A, P3005B (Maine Yankee); P3006A, P3006B, P3006C (Yankee Atomic).

## II.   Corporate Existence Dates in the Non-Breach World

A central assumption of plaintiffs' damages claims is that they are entitled to recover the full amount of costs incurred after the date on which each utility would have gone out of business in the non-breach world.  Essentially, plaintiffs argue that at some point during this claim period, the liability not only for fuel storage, but also for corporate existence costs, shifts entirely to the government.  *See* Tr. at 38:5-9 (Norton).  As noted above, plaintiffs contend that the government is no longer entitled to any offsets for Maine Yankee at the end of 2008, and for Connecticut Yankee and Yankee Atomic at the end of 2010.

To establish that these assumptions are appropriate, plaintiffs rely on the experience and testimony of several executive officers, including Mr. Wayne Norton, who serves as President and Chief Executive Officer of Yankee Atomic and Connecticut Yankee and Chief Nuclear Officer for Maine Yankee, *see* Tr. at 9:13-16 (Norton); Mr. Todd Smith, the Director of Operations for all three utilities, *see* Tr. at 77:24-78:7 (Smith); and Ms. Carla Pizzella who serves as the Vice President, Chief Financial Officer and treasurer for all three utilities, as well as assistant secretary for Connecticut Yankee and assistant clerk for Yankee Atomic, *see* Tr. at 184:2-4 (Pizzella).

In determining the dates on which the utilities would have been out of business in the non-breach world, the utilities first assumed that decommissioning would have occurred on the same date in the non-breach world as it did in the real world.  *See* Tr. at 26:19-28:1 (Norton).  Maine Yankee completed physical decommissioning in 2004, and limited the scope of its license to accommodate only fuel storage in 2005.  *See* Tr. at 28:10-20 (Norton).  Both Connecticut Yankee and Yankee Atomic were decommissioned in 2007, and plaintiffs assumed they would have terminated their licenses at approximately the same time.  *See* Tr. at 34:10-15, 35:23-36:4 (Norton).

The utilities then "estimated the period of time it would take to terminate our benefits programs, disposition our assets and liabilities, including our property, and then ultimately submit to the respective states—Maine, Massachusetts, and Connecticut—our cessation of existence and termination of our corporations under the appropriate filings with the state."  Tr. at 28:2-8 (Norton).  Mr. Norton, Ms. Pizzella, and Mr. Smith, three individuals who were intimately involved with critical

aspects of the businesses, collaborated as a team to arrive at these estimates.  *See* Tr. at 47:7-52:23, 63:14-64:22 (Norton).

Their estimates and assumptions, although necessarily hypothetical due to the government's breach of the Standard Contracts, were not untethered from real world experience.  Many of the activities required to shut down the utilities overlap with tasks actually performed by the companies in the course of downsizing to the current steady-state of operations.  Mr. Norton described the process of downsizing the companies in his testimony:

> [I]t's a series of regulatory changes; it's a series of programmatic and process changes; it's a series of physical changes at the facility; it's winding down staffing; it's terminating union agreements; it's unwinding assets and liabilities; and getting to the point where you can, in our case, store spent nuclear fuel at a facility that has a reduced license and a reduced organizational structure to support fuel storage until it's removed.

Tr. at 16:10-17 (Norton).  Ms. Pizzella has managed the termination of three pension plans and two 401(k) plans for plaintiffs.  *See*  Tr. at 194:17-25.  Pension plans are not health and welfare benefit plans, but pension plans are more complicated to terminate due to governing federal regulations that do not apply to the plans at issue here. *See* Tr. at 195:1-196:25 (Pizzella).  In addition, Maine Yankee and Connecticut Yankee have actually gone through the process of dispositioning property that is unencumbered by the presence of spent nuclear fuel. *See* Tr. at 324:16-23 (Richardson) (describing Connecticut Yankee's property disposition); Tr. at 337:11-342:1 (Richardson) (describing Maine Yankee's property disposition).

Mr. Norton and Mr. Smith estimated that it would take an additional three years, or until the end of 2008, for Maine Yankee to complete these activities and wind up corporate existence.  *See* Tr. at 29:1-2 (Norton), Tr. at 122:7-124:5 (Smith).  After conducting a similar analysis for Connecticut Yankee and Yankee Atomic, Mr. Norton and Mr. Smith determined that both utilities would have been out of business in the non-breach world by the end of 2010.  *See*  Tr. at 34:10-36:14 (Norton); Tr. at 124:13-25, 147:21-148:8, 152:25-153:5 (Smith).

The government takes issue with the authority that Mr. Norton, Ms. Pizzella, and Mr. Smith have to determine the actions and time periods that would have been necessary in order to terminate the corporate existence of the utilities, claiming that their testimony lacked specificity and that the witnesses lacked expertise in winding

down corporations. *See* Doc. 42 at 14-18. The court disagrees. In the court's view, Mr. Norton, Ms. Pizzella, and Mr. Smith were all credible witnesses and are each well-positioned to understand and testify to the details of the businesses involved in this case. Their testimony provides a solid foundation for the court's conclusion regarding the dates on which each utility would have been out of business in the non-breach world.

The court finds that, absent the government's breach, Maine Yankee would have been out of business by the end of 2008, while Connecticut Yankee and Yankee Atomic would have been out of business by the end of 2010.

## III.  Defendant's Specific Challenges

Apart from its position that plaintiffs should recover no damages due to their alleged failure to present a plausible non-breach world model, the government takes issue with four specific categories of claimed damages.

### A.  Benefits Program Administration Costs

Plaintiffs provide post-retirement health and welfare benefits plans to eligible employees. *See* Tr. at 185:22-25 (Pizzella). The plans include medical, dental, and life insurance benefits. *See* Tr. at 186:17-187:5 (Pizzella). The plans are funded through utility rates and maintained in a Voluntary Employees' Beneficiary Association Fund for Retiree Welfare, or a VEBA trust account. *See* Tr. at 188:15-190:7 (Pizzella). In the course of administering these plans, plaintiffs incur costs for legal and actuarial services. *See* Tr. at 190:8-191:15 (Pizzella).

All three plaintiffs claim that their respective benefits plans would have been terminated before or during the instant claims period—Maine Yankee at the end of 2006, *see* Tr. at 197:5-9 (Pizzella), and Connecticut Yankee and Yankee Atomic at the end of 2008 (with minimal costs into 2009), *see* Tr. at 197:10-16, 201:21-202:24, 205:21-206:16 (Pizzella). As a result, the argument goes, all costs associated with administering the plans after those dates are recoverable. *See* Doc. 39 at 24.

Plaintiffs claim the following amounts:   Maine Yankee, $456,633; Connecticut Yankee, $375,845; and Yankee Atomic, $295,580; for a total of $1,128,058. *See* Ex. P3012.

Plaintiffs had the option to terminate the benefits plans in one of three ways, and the complete discretion to choose between them. *See* Tr. at 197:24-198:7,

199:15-17 (Pizzella).  Plaintiffs could have:  (1) terminated the plans without making any payments to beneficiaries, *see* Tr. at 198:5-7 (Pizzella); (2) made a lump-sum payment from the trust, divided equally among beneficiaries, *see* Tr. at 198:9-17 (Pizzella); or (3) sold the obligation to pay benefits to a third party administrator, *see* Tr. at 198:18-19 (Pizzella).

The damages that plaintiffs claim in this case are administrative costs paid out of the utilities' operating budgets, not drawn from the corpus of the VEBA trust.  *See* Tr. at 191:9-15 (Pizzella).  According to plaintiffs, however, all costs associated with terminating the benefits plans under any of the three available methods would come from the trust assets. Tr. at 207:1-10, 236:15-237:9 (Pizzella).  As a result, plaintiffs take the position that the non-breach world model need not include any offset for future administration costs, regardless of the method of termination.  *See* Doc. 43 at 19; Tr. at 236:17-237:9, 207:1-10 (Pizzella).

At trial, because they insisted it did not make any accounting difference, plaintiffs refused to choose which method of termination they would have pursued in the non-breach world.  *See* Tr. at 199:18-200:11; 207:1-10; 236:15-237:9 (Pizzella).  In post-trial briefing, however, plaintiffs stated that they would have been most likely to choose the lump-sum payment to beneficiaries.  *See* Doc. 45 at 11. Ms. Pizzella testified that if the plan obligations were transferred to a third party, the costs of future administration would be included in the purchase price, which would be paid out of the trust assets.  *See* Tr. at 207:1-10; 236:15-237:9 (Pizzella).  But plaintiffs have admittedly engaged in no cost analysis for the lump-sum payment option.  *See* Tr. at 242:7-11 (Pizzella).

The government agrees that plaintiffs retain discretion as to the method of termination, and do not seriously challenge the dates on which plaintiffs claim the plans would have been terminated in the non-breach world.  *See* Doc. 42 at 24-33. It disagrees, though, that administration costs that are currently paid out of the operating budget could be paid from the corpus of the trust in the event of termination.  For instance, the government's expert Mr. Larry Johnson, testified that if plaintiffs sold the plan obligations to a third party, they would have been required to make a lump-sum payment from their operating budgets to cover future administrative costs that were "economically equivalent" to the costs incurred in the breach world.  *See*  Tr. at 406:4-407:9 (Johnson).

Proceeding from this assumption, the government insists that in order to demonstrate a plausible non-breach world scenario, plaintiffs are required to elect between the three methods of termination and account for offsets of any

administration costs.  *See* Doc. 42 at 29.  Because plaintiffs refused to do so, the government contends, they have failed to prove their damages. *See id.*

## B.    SWEC Proceeds

Because the government failed to perform under the Standard Contract, Maine Yankee contracted with Stone and Webster Engineering Corporation ("SWEC") to build dry storage facilities and perform decommissioning activities.  SWEC failed to perform and went bankrupt.  Maine Yankee recovered damages from SWEC's insurer and as part of a settlement with SWEC's bankruptcy estate.  The recovered funds were allocated between Maine Yankee's decommissioning effort and as an offset to the government's damages for construction of dry storage facilities.[3]

Although the court addressed the allocation issue in the second round of this litigation, it has resurfaced now because Maine Yankee received an additional $1,421,000 from the settlement during the instant claim period.  *See*  Tr. at 207:23-208:13 (Pizzella).  The funds resulted from the resolution of coverage issues with SWEC's insurer.  *See* Tr. at 38:25-39:17 (Norton).  Of the total amount received, Maine Yankee allocated 90% as an offset to its claim against the government, and attributed the remaining 10%, or $142,100, to its decommissioning costs.  *See* Tr. at 208:14-21 (Pizzella).

Maine Yankee decided to use the 90/10 allocation in accordance with an Offer of Settlement, approved by FERC, which provided for the proper division of any additional payments received from the SWEC bankruptcy in excess of $1 million. *See* Tr. at 207:23-210:19 (Pizzella).  The agreement stated, in relevant part:

> To the extent that Maine Yankee receives more than $1 million in such additional payments on [the SWEC bankruptcy proceeding], on or after such execution date, the Parties agree that Maine Yankee will be permitted to receive 10% of the amount so received over $1 million as an additional Incentive Budget payment.  Maine Yankee may withdraw any such additional Incentive Budget payment from the decommissioning trust as a valid decommissioning expense, and distribute to Maine Yankee's owners.

---

[3] The court's opinion in the second round of this litigation explained Maine Yankee's recovery and its allocation in more detail than is necessary to repeat here.  *See Yankee Atomic Elec. Co. v. United States*, 113 Fed. Cl. 323 (2013).

Ex. P3010 at 10.

The government objects to this allocation, claiming that the entire amount of additional funds should be set off from Maine Yankee's claim. *See* Doc. 42 at 37; Tr. at 395:17-21 (Johnson). This position is based on the government's view that such an offset is mandated by this court's previous opinion on the allocation issue. *See id.*

## C.   Property Transfer Costs

In 2007, Connecticut Yankee and Yankee Atomic hired a consulting firm, Vita Nuova, to assist the utilities in navigating the process of dispositioning their properties. *See* Tr. at 315:2 (Richardson). According to Ms. Elaine Richardson, Vita Nuova's Vice President, the company "specialize[s] in redevelopment, redevelopment planning and consulting services related to . . . lands that are complicated by either environmental conditions or other challenges, be it legal or regulatory, that may impact the ability to sell a property." Tr. at 287:23-288:6 (Richardson). Over the government's objection, the court qualified Ms. Richardson as an expert in the "disposal of challenged real estate." Tr. at 306:14.

Ms. Richardson acted as project manager for both utilities. *See* Tr. at 314:4-6; 320:12-15 (Richardson). The work Vita Nuova performed for the utilities involved: (1) reuse assessments to consider the relevant challenges of each parcel and options for disposition, *see* Tr. at 312:21-319:5, 326:15-331:21 (Richardson); (2) efforts to identify interested purchasers, *see* Tr. at 319:6-320:19, 332:1-333:22 (Richardson); and (3) assisting with negotiations and purchase and sale agreements, *see* Tr. at 322:6-22 (Richardson).

Based on the assessments and subsequent efforts to sell the property, Ms. Richardson expressed the opinion that had the government performed under the Standard Contracts, both Connecticut Yankee and Yankee Atomic could have dispositioned the subject properties by the end of 2009. *See* Tr. at 325:7-23; 335: 3-24 (Richardson). Although Vita Nuova did not perform the same services for Maine Yankee, based on a review of the assessments and efforts to sell the property made by a different company, Ms. Richardson concluded that Maine Yankee would have been able to disposition all of its property in the non-breach world by the end of 2006. *See* Tr. at 343:7-344:19 (Richardson).

Vita Nuova charged $124,186 for the work performed with respect to the Connecticut Yankee property between 2009 and 2012. *See* Tr. at 346:11-14

(Richardson); Ex. P3020; Tr. at 156:13-21 (Smith).  The company charged Yankee Atomic $198,237 for services performed in the same time period.  *See* Tr. at 349:2-5 (Richardson); Ex. P3020; Tr. at 156:13-21 (Smith).

Plaintiffs asked Ms. Richardson to provide an estimate of the fees that would have been charged in the non-breach world, where the presence of spent nuclear fuel would not have been one of the challenges with the property.  *See* Tr. at 346:15-20 (Richardson).  In order to determine the portion of work attributable to the presence of spent nuclear fuel, Ms. Richardson personally reviewed the invoices and back up documentation associated with each project.  *See* Tr. at 346:12-348:20, 349:2-351:16 (Richardson).  After her detailed review, and using her personal knowledge of the projects as project manager, Ms. Richardson concluded that approximately 40% of the work for Connecticut Yankee was related to the presence of spent fuel, *see* Tr. at 348:24-349:1 (Richardson), while 20% of the work for Yankee Atomic was related to the fuel, *see* Tr. at 349:13-15 (Richardson).  Ms. Richardson testified that her estimates were different for each company because in arriving at her conclusions she took into account the specific, unique challenges at each property.  *See* Tr. at 349:16-351:16 (Richardson).

Applying Ms. Richardson's percentages to the total invoiced amount for each company results in a claim for damages in an amount of $89,321—$49,674 from Connecticut Yankee, and $39,647 from Yankee Atomic.  *See* Ex. P3020.[4]

The government does not claim that the Vita Nuova costs were not incurred, but rather, that plaintiffs should not recover these fees because Ms. Richardson's method for determining the percentage of the work attributable to the presence of spent nuclear fuel was unreliable.  *See* Doc. 42 at 40-45.

### D.    Legal and Tax Expenses Related to Phase I Damages

The final category of damages to which the government specifically objects is plaintiffs' claims to recover legal and tax expenses that they incurred as a result of receiving a payment for damages awarded in the first round of this litigation.  *See* Doc. 39 at 38-39. During the instant claim period, plaintiffs received large payments as a result of the first judgments in this case.  *See*  Tr. at 211:9-12 (Pizzella).

---

[4] Plaintiffs' Ex. P3020 actually reflects an amount of $39,648 for property transfer costs incurred by Yankee Atomic.  After reviewing the figures, and independently applying Ms. Richardson's percentages to the total costs incurred, it appears to the court that the correct figure is $39,647, and the discrepancy is likely the result of a rounding error.

Ms. Pizzella testified that upon receipt of "[a]ny large cash stream . . . we have to do a rate filing and a financial analysis to show to FERC our funding needs and our ability to return the money to our wholesale customers."   Tr. at 211:17-24 (Pizzella).  In addition to expenses related to meeting the regulatory requirements, plaintiffs engaged tax consultants in order to understand the tax implications of receiving such large sums of money.  *See* Tr. at 211:25-212:14 (Pizzella).

Plaintiffs incurred a total of $30,227 in sorting out the legal and tax implications of receiving funds from the first round judgments, divided between the companies as follows:  Maine Yankee, $10,500; Connecticut Yankee, $13,727; and Yankee Atomic $6,000.  *See* P3013 (the parties agreed during trial to exclude the category of "travel expenses" reflected on this exhibit, *see* Tr. at 214:13-14).  Ms. Pizzella testified that these expenses are reasonable based on her experience with the providers on similar, unrelated matters.  *See* Tr. at 214:2-4 (Pizzella).

The government objects to plaintiffs' recovery of these expenses because it argues that the costs are legally unrecoverable costs of litigation.  *See* Doc. 42 at 45-46.

## CONCLUSIONS OF LAW

As this court has often noted, traditional contract principles govern spent nuclear fuel disputes.  At the most basic level, the appropriate remedy for the government's breach "is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed."  *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (citations omitted).  Specifically, "[d]amages for a breach of contract are recoverable where:  (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty."  *Id.* (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002)).

To establish that damages were reasonably foreseeable, "a plaintiff must show that the type of damages are foreseeable as well as the fact of damage."  *See Vermont Yankee Nuclear Power Corp. v. Entergy Nuclear Vermont Yankee*, 683 F.3d 1330, 1344 (Fed. Cir. 2012).  As the Federal Circuit has explained:

Although this does not require "actual foresight" that the breach will cause a "specific injury or a particular amount in money[,] . . . the injury actually suffered [still] must be *one of a kind that the defendant had*

*reason to foresee* and of an amount that is not beyond the bounds of reasonable prediction."

*Id.* (citing Joseph M. Perillo, 11 *Corbin on Contracts* § 56.7 at 108 (rev. ed. 2005) (emphasis added)).

It is then plaintiffs' burden to demonstrate that the government's breach was a "substantial causal factor" in the damages they seek to recover. *Indiana Michigan*, 422 F.3d at 1373. *See Yankee Atomic Elec. Co.*, 536 F.3d at 1273, and *Yankee Atomic Elec. Co. v. United States*, 113 Fed. Cl. 323, 332 (2013) (noting that both the "substantial causal factor" test and the "but-for" test are both acceptable standards for determining causation, and choosing to apply the former). To do this, the plaintiff must submit a "comparison between the breach and non-breach worlds." *Yankee Atomic*, 536 F.3d at 1273. The plaintiff bears the burden of proving "the extent to which his incurred costs differ from the costs he would have incurred in the non-breach world." *Energy Nw. v. United States*, 641 F.3d 1300, 1306 (Fed. Cir. 2011).

And, although damages must be "shown with reasonable certainty," they need not be "ascertainable with absolute exactness or mathematical precision," but "recovery for speculative damages is precluded." *Indiana Michigan*, 422 F.3d at 1373 (citations omitted). Enough evidence to allow the court to make "a fair and reasonable approximation" is required. *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (citations omitted).

In this round of litigation, plaintiffs have alleged entitlement to damages in the amount of $77.9 million. *See* Doc. 39 at 6. Those damages fall into five categories: (1) operational costs not specifically contested at trial, (2) the costs to plaintiffs of administering their health and welfare plans, (3) the proper allocation of settlement proceeds from the SWEC litigation, (4) costs associated with transfer of the property on which the nuclear plants were situated, and (5) the legal and tax expenses related to damages recovered in the first round of this litigation.

## I. Operational Costs Not Specifically Contested At Trial

The government has put forth no argument or evidence that plaintiffs did not incur the claimed expenses, beyond what may have been resolved as part of the audit process. Rather, it raises objections to the legal sufficiency of plaintiffs' proof with regard to the non-breach world models presented at trial. *See* Doc. 42 at 14-24.

As a starting point, plaintiffs may only recover costs caused by the government's breach if those costs would not have been incurred in the non-breach world. *See Indiana Michigan*, 422 F.3d at 1373 ("The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been in had the breaching party fully performed."). In order to prove those damages, a plaintiff must "submit a hypothetical model establishing what its costs would have been in the absence of a breach," and bears the burden of proving "the extent to which his incurred costs differ from the costs he would have incurred in the nonbreach world." *Energy Nw.*, 641 F.3d at 1305-06.

Plaintiffs have submitted non-breach world models to support their damages claims, which the government argues are insufficient. *See* Exs. P3004B, P3006B.

First, the government attacks the dates on which plaintiffs claim each utility would have been out of business, a critical piece of the non-breach world models, arguing that plaintiffs engaged in "no specific analysis" of the issue and simply made unsupported assumptions of what the dates would have been. Doc. 42 at 14. As explained in the court's findings of fact, the court disagrees. Plaintiffs actually engaged in much of the activity required to shut down the plants in the course of down-sizing to the steady-state existence. Furthermore, plaintiffs' witnesses are well-positioned to fill in the blanks that were created by the government's failure to perform.

The government then argues that even if the court agrees with the plaintiffs' termination dates, plaintiffs cannot recover any actual costs because they "offered no foundation or support for their non-breach scenario (in the form of estimated offsets to their actual costs) at trial." Doc. 42 at 20. It claims that plaintiffs were entirely unable to estimate non-breach world costs without the help of outside counsel. *See id.* at 20-21. Plaintiffs did consult an attorney with regard to some non-breach world costs, and the government characterizes that attorney as the "lynchpin" of the plaintiffs' claims. *Id.* The government argues that because the attorney did not testify, the models have insufficient foundation. *See id.*

The government's position is an unsupported exaggeration of outside counsel's role in the non-breach world analysis. As Mr. Smith testified at trial, the attorney was only consulted *after* the non-breach world model had been prepared. *See* Tr. at 123:5-124:5, 173:21-176:2 (Smith). The government presents this fact as a craven attempt on plaintiffs' part "apparently to infuse the model with some credibility," but fails to explain how its characterization of the attorney as the

14

"lynchpin" of the model squares with the fact that he had no hand in creating it.  Doc. 42 at 21.

Although not framed precisely in terms of the applicable legal standard, the heart of the government's argument seems to be that the plaintiffs have failed to prove damages to a reasonable certainty. *See Indiana Michigan*, 422 F.3d at 1373 (noting that damages need not be "ascertainable with absolute exactness or mathematical precision," but "recovery for speculative damages is precluded") (citations omitted).   Stated differently, the government implies that plaintiffs have failed to provide enough evidence to allow the court to make "a fair and reasonable approximation" of damages. *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (citations omitted).  The government claims that neither Ms. Pizzella, Ms. Richardson, Mr. Norton, nor Mr. Smith gave reliable testimony.  Doc. 42 at 15-17.  As a result, the government claims, that "[p]laintiffs' complete failure to elicit qualified evidence at trial makes it impossible for them to support their non-breach financial scenario." *Id.* at 19.

Contrary to the government's contention, plaintiffs provided not only detailed documentation of their non-breach world models, but also a detailed explanation of how they arrived at the figures included in those models.  Mr. Smith testified that the non-breach world models used in this case were extensions of the models presented in the second round cases. *See* Tr. at 99:24-100:14 (Smith).  The initial models were designed by starting with actual operating budgets for each company in the years after completing decommissioning. *See id.*  Mr. Smith, Mr. Norton, and Ms. Pizzella then evaluated each line in the budgets and made a determination as to whether a similar activity would have been required in the non-breach world. *See id.*; Tr. at 62:15-64:22 (Norton), 105:15-106:2 (Smith).  The models were later refined through discussions with the government. *See* Tr. at 114:13-19 (Smith), 282:21-284:2 (Pizzella).

The difference in this round of litigation, of course, is that plaintiffs have established that all three utilities would have been out of business either prior to or during the instant claims period.  The proposed offsets for costs that the utilities would have incurred in the non-breach world are, therefore, different. Because Maine Yankee would have been out of business by the end of 2008, it makes no offset to costs incurred in this claims period. *See* Tr. at 28:24-34:2 (Norton), 122:7-124:5 (Smith).  For both Connecticut Yankee and Yankee Atomic, plaintiffs offset their damages claims for operating expenses through the time each utility would have been out of business, at the end of 2010. *See* Tr. at 34:10-36:14 (Norton), 124:13-25, 147:21-148:8, 152:25-153:5 (Smith).   Mr. Smith provided detailed

explanations of the costs and assumptions built into the models. *See* Tr. at 124:13-127:23, 130:24-133:10, 147:21-155:22 (Smith).

The court found plaintiffs' witnesses credible and believes that they presented the best information possible in the non-breach world models. The government is admonished to remember that its own failure to perform is the principle reason that the plaintiffs are able to present non-breach world costs only with reasonable certainty, rather than with absolute certainty.

Although neither party presents a foreseeability analysis for the general operational expenses, the court notes that the record supports a finding that the claimed costs were sufficiently foreseeable to justify recovery. In order to recover, plaintiffs must demonstrate that both the type and amount of damages sought were reasonably foreseeable at the time of contracting. *See Vermont Yankee Nuclear Power Corp. v. Entergy Nuclear Vermont Yankee*, 683 F.3d 1330, 1344 (Fed. Cir. 2012).

The actual costs at issue here are storage facility operational costs incurred by each utility during the claims period. *See* Doc. 39 at 11; Tr. at 91:21-92:3 (Smith). As the court has previously noted, dry storage construction and maintenance were reasonably foreseeable in the event of the government's breach. *Yankee Atomic*, 73 Fed. Cl. at 267 (concluding that "absent DOE performance the need to spend substantial sums for additional at-reactor storage was reasonably foreseeable at the time of contracting"); *id.* at 288 ("The court finds that substantial SNF . . . dry storage costs were reasonably foreseeable to DOE, the breaching party at the time of contracting."); *Yankee Atomic*, 94 Fed. Cl. at 710-711 (holding that "[i]n [the] non-breach world, the Yankees' dry storage costs would have been zero because dry storage would not have been built," and noting that the Federal Circuit affirmed the "reasonableness and foreseeability" of the dry storage costs in *Yankee Atomic*, 536 F.3d 1268). Furthermore, the rather extreme expense of maintaining spent nuclear fuel storage is entirely logical. *See Yankee Atomic*, 113 Fed. Cl. at 346 (noting that "[n]uclear fuel storage is inherently a sensitive and expensive endeavor") (citing *Yankee Atomic*, 73 Fed. Cl. at 253 (stating that the disposal of SNF poses a "severe potential health hazard" with "complex technical problems") (citations omitted); *id.* at 251 (noting that domestic utilities were required to enter into the Standard Contracts at issue here due in part to the highly-regulated nature of the nuclear industry, and that DOE agreed to accept the fuel "in return for payment of substantial fees" by the utilities)).

This case presents a new foreseeability issue—whether it was reasonably foreseeable at the time of contracting that plaintiffs would incur damages for corporate existence in the event that the utilities were forced to remain in business as a result of the government's continuing breach. A finding that such damages were reasonably foreseeable is a logical and only incremental extension of the court's previous holdings, and is fully supported by the evidence. The claims are based on dry storage operational costs, which the court has already found to be reasonably foreseeable. And even the language of the Standard Contracts contemplates that the utilities would, at some point, cease producing spent nuclear fuel for the government to dispose of. *See, e.g.,* Ex. P3001 at 8 ("The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors . . . has been disposed of.").

Subject to analysis of the government's specific objections, plaintiffs are entitled to recover damages for operational expenses in all three cases.

## II.    Benefits Administration Costs

Plaintiffs seek to recover all costs associated with administration of their health and welfare benefits plans that were incurred beyond the dates on which each plan would have been terminated in the non-breach world. *See* Doc. 39 at 24. Maine Yankee asserts that it would have terminated its plan by the end of 2006, *see* Tr. at 197:5-9 (Pizzella), while both Connecticut Yankee and Yankee Atomic assert that their respective plans would have been terminated in 2008, with some residual costs incurred in 2009, *see* Tr. at 197:10-16, 201:21-202:24, 205:21-206:16 (Pizzella).

As the court previously explained, plaintiffs have complete discretion to terminate these plans in one of three ways. Plaintiffs could have: (1) terminated the plans without making any payments to beneficiaries, *see* Tr. at 198:5-7 (Pizzella); (2) made a lump-sum payment from the trust, divided equally among beneficiaries, *see* Tr. at 198:9-17 (Pizzella); or (3) sold the obligation to pay benefits to a third party administrator, *see* Tr. at 198:17-18 (Pizzella).

At trial, plaintiffs refused to take a position as to which method of termination they would have selected in the non-breach world. *See* Tr. at 200:7-11 (Pizzella). Plaintiffs claim that any costs associated with effectuating the terminations would come from the trust assets rather than the utilities' operating budgets, thus not requiring any offset in the non-breach world models that support plaintiffs' damages claims in this case. *See* Doc. 43 at 19; Tr. at 207:1-10, 236:15-237:9 (Pizzella). Ms.

Pizzella testified to this fact based on her experience transitioning pension obligations to third parties, and did not cite any basis for her assumption that funding administrative costs would work the same way for health and welfare benefits. *See* Tr. at 236:15-237:9 (Pizzella). At oral argument, plaintiffs conceded that Ms. Pizzella's testimony was the only evidence in the record to support this assumption. *See* Oral Arg. Recording, at 1:14:45PM-1:14:55PM (Feb. 19, 2016).

The government presented expert testimony that contradicted Ms. Pizzella's position. Mr. Larry Johnson testified that if plaintiffs sold the plan obligations to a third party, they would have been required to make a lump-sum payment from their operating budgets to cover future administrative costs that were "economically equivalent" to the costs incurred in the breach world. *See* Tr. at 376:19-25, 429:5-18 (Johnson). On the basis of this testimony, the government argues that in order to demonstrate a plausible non-breach world scenario, plaintiffs are required to elect between the three methods of termination and account for offsets of any administration costs. *See* Doc. 42 at 29. Because plaintiffs refused to do so, the government contends, they have failed to prove their damages. *See id.*

Neither party is entirely correct on this point. Contrary to the government's argument, the court would have no reason to require plaintiffs to select between the methods of termination if, in fact, plaintiffs had proven that any costs associated with any of the three methods would have come from the trust funds as opposed to the utilities' operating budgets. The problem for plaintiffs' case is that they did not present sufficient evidence on this point. Plaintiffs performed no financial analysis on either of the first two options. *See* Tr. at 198:3-9 (Pizzella) (stating that plaintiffs would not have chosen to terminate the plans without payment to employees); Tr. at 242:7-11 (Pizzella) (admitting that no analysis was done with regard to the cost of the lump sum payment option). And with regard to the possibility of transferring the obligation to a third party, the court is left with nothing more than competing testimony from Ms. Pizzella and Mr. Johnson on which to base its decision. Both Ms. Pizzella and Mr. Johnson were credible witnesses, but neither possesses expertise in the area of terminating or transferring health and welfare benefits plans. As such, the evidence is in equipoise, and plaintiffs have failed to carry their burden.

Plaintiffs are not entitled to recover the costs of health and welfare benefits administration.

## III.   SWEC Proceeds

During the instant claims period, Maine Yankee received final proceeds from the SWEC bankruptcy proceedings in an amount of $1,421,000. *See* Tr. at 207:23-208:13 (Pizzella). The parties disagree, as they did in the previous round of litigation, regarding how these funds should be allocated between Maine Yankee's decommissiong effort and as an offset to the government's damages for construction of dry storage facilities.

Plaintiffs have allocated 90% of the funds as an offset to its claim against the government, and attributed the remaining 10%, or $142,100, to its decommissioning costs. *See* Tr. at 208:14-21 (Pizzella). As noted above, Maine Yankee decided to use the 90/10 allocation in accordance with an Offer of Settlement, approved by FERC, which provided for the proper division of any additional payments received from the SWEC bankruptcy in excess of $1 million. *See* Tr. at 207:23-210:19 (Pizzella). The agreement stated, in relevant part:

> To the extent that Maine Yankee receives more than $1 million in such additional payments on [the SWEC bankruptcy proceeding], on or after such execution date, the Parties agree that Maine Yankee will be permitted to receive 10% of the amount so received over $1 million as an additional Incentive Budget payment. Maine Yankee may withdraw any such additional Incentive Budget payment from the decommissioning trust as a valid decommissioning expense, and distribute to Maine Yankee's owners.

Ex. P3010 at 10.

The government objects to this allocation, claiming that the entire amount of additional funds should be set off from plaintiff's claim. *See* Doc. 42 at 37; Tr. at 395:17-21 (Johnson). This position is based on the government's view that such an offset is mandated by this court's previous opinion on the allocation issue. *See id.* The government claims that the court "adopted the cap methodology" advocated by Maine Yankee in the second round of this litigation. Doc. 42 at 36.

The government has misread the court's previous opinion. Rather than adopt Maine Yankee's methodology, the court simply held plaintiff to its proposed offset because the government's own logic would have resulted in an even smaller offset than plaintiff was willing to give. *See Yankee Atomic Elec. Co.*, 113 Fed. Cl. at 339 ("Because [the figure resulting from the method of calculation presented by the

government] is well-below the $5.4 million that Maine Yankee has already allocated, the court denies the government's claim to an additional credit.  The court will, however, hold Maine Yankee to its $5.4 million figure.").

The FERC settlement agreement expressly allows Maine Yankee to allocate 10% of any additional recovery, or $142,100 in this case, as a decommissioning expense.  The government has presented no argument or evidence that the agreement is invalid or otherwise does not apply in the current circumstances, beyond its incorrect argument with regard to the court's previous opinion.  As such, the court finds that Maine Yankee's decision to allocate 90% of the SWEC proceeds as an offset to its claim for damages is proper.

## IV.    Property Transfer Costs

Connecticut Yankee and Yankee Atomic hired Vita Nuova, a consulting firm that specializes in dealing with challenged properties, to assist the utilities in dispositioning their land.  The work Vita Nuova performed for the utilities included: (1) reuse assessments to consider the relevant challenges of each parcel and options for disposition, *see* Tr. at 312:21-319:5, 326:15-331:21 (Richardson); (2) efforts to identify interested purchasers, *see* Tr. at 319:6-320:19, 332:1-333:22 (Richardson); and (3) assisting with negotiations and purchase and sale agreements, *see* Tr. at 322:6-22 (Richardson).  For these services, Vita Nuova charged Connecticut Yankee $124,186, and charged Yankee Atomic $198,237.  *See* Ex. P3020.

Ms. Elaine Richardson, Vita Nuova's Vice President, served as project manager on both accounts.  *See* Tr. at 287:22-288:6, 314:6-320:12-15 (Richardson).  At trial, the court qualified her as an expert in dispositioning challenged properties.  *See* Tr. at 306:8-16 (Richardson).  On the basis of her expertise, she testified with regard to the time it would have taken in the non-breach world to disposition property that is now complicated by the presence of dry storage facilities.  *See* Tr. at 324:24-325:23, 335:3-337:10 (Richardson).

Ms. Richardson also testified at trial that the actual cost of Vita Nuova's services was higher than it would have been in the non-breach world due to the presence of spent nuclear fuel on the sites.  Specifically, she concluded that approximately 40% of the work for Connecticut Yankee was related to the presence of spent fuel, *see* Tr. at 348:24-349:1 (Richardson), while 20% of the work for Yankee Atomic was related to the fuel, *see* Tr. at 349:13-15 (Richardson).  Plaintiffs now seek to recover this difference as part of their breach damages.

In coming to these percentages, Ms. Richardson personally reviewed the invoices and back up documentation associated with each project. *See* Tr. at 346:12-348:20, 349:2-351:16 (Richardson). She testified that the percentages were different for each company because in arriving at her conclusions she took into account the specific, unique challenges at each property. *See* Tr. at 349:16-351:16 (Richardson). Ms. Richardson did not produce documentation of her review process or any sort of work papers to support her conclusions.  Rather, her estimates were based on her personal knowledge of the projects.

At trial, the government objected to her testimony on this point, and the court heard the evidence as an offer of proof.  *See* Tr. at 303:4-8.  The government does not take issue with costs incurred, but argues that Ms. Richardson's methodology for arriving at these estimates is unreliable, and therefore, that plaintiffs cannot recover.  *See* Doc. 42 at 40-45.  In addition, according to the government, Ms. Richardson's testimony is inadmissible because "specialized expertise is necessary to determine what Vita Nuova costs were attributable to the presence of spent fuel," and she was not qualified as an expert on this issue.  *See id.* at 44.

As an initial matter, the court sees no reason that expert testimony would be required to apportion Vita Nuova's invoices.  Under Federal Rule of Evidence 701, lay opinion testimony is sufficient so long as the opinion is:

(a)   rationally based on the witness's perception;
(b)   helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
(c)   not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

By way of explication, the Advisory Committee noted that most courts do not require expert testimony on financial matters relating to a business's value or expected profits, so long as the offered testimony is based on "particularized knowledge that the witness has by virtue of his or her position in the business." Fed. R. Evid. 701, Advisory Committee Notes, 2000 Amendments (citing *Lightning Lube, Inc. v. Witco Corp.* 4 F.3d 1153 (3d Cir. 1993) (finding no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business).

The government claims that expert testimony is required under these circumstances because Ms. Richardson did more than simply add numbers. *See* Doc. 42 at 44.  To support this position, the government cites several cases.  First, the

government points to *In re MarketXT Holdings Corp.*, No. 1:04-12078 (ALG), 2011 WL 1422012 (Bankr. S.D.N.Y. Jan. 7, 2011).  In that case, the Bankruptcy Court for the Southern District of New York excluded lay testimony that related to "the state of the securities markets, the state of the day-trading industry, customs and practices within the day-trading industry, and the alleged potential profitability of the MTG, measured by its own characteristics and by comparison with the performance of allegedly similar groups."  *See id.*, at \*1.  The court reasoned that the proposed testimony should be excluded because it was not an opinion based on actual business performance within the witness's own perception, but was based on a series of complex assumptions relating to financial market performance.  *See id.*, at \*5, \*6.

The government also cites *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004) and *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171 (2d Cir. 2004).  In *LifeWise*, the appellate court held that the company's Chief Executive Officer was improperly allowed to testify as to lost profits because his testimony was not based simply on his personal knowledge of the company's operations, but instead involved "rolling averages, S-curves, and compound growth rates that appear to be an amalgam of logic, hope, and economic jargon."  *LifeWise*, 374 F.3d at 930.  And continuing with the common thread that only testimony based on personal knowledge is permitted, the appellate court in *Bank of China*, disallowed a witness's testimony because it was "not based entirely on [the company employee's] perceptions," but also required reference to his "experience and specialized knowledge in international banking."  *Bank of China*, 359 F.3d at 181.

The testimony regarding complex projections and specialized knowledge of financial markets and banking involved in the cases highlighted by the government bears no resemblance to Ms. Richardson's testimony here. Her opinion was rooted not only in her particularized knowledge of Vita Nuova's work and billing practices, but in her significant personal involvement with the specific projects she was asked to review.  Ms. Richardson considered actual invoices, for work actually performed, on projects managed by her, to draw her conclusions regarding what portion of that work was required as a result of the presence of spent nuclear fuel.  Her testimony on this issue is admissible under Rule 701 as lay opinion.

The government also attacks the reliability of her methods—whether she is considered a lay or an expert witness.  *See* Doc. 42 at 42-43.  Had the court concluded that expert testimony was required on this point, plaintiffs would have been required to demonstrate that Ms. Richardson's methods were reliable.  *See* Fed. R. Evid. 702 (requiring that "(c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the

case"). Because her testimony is acceptable as a lay opinion, however, the government's criticism of her approach goes to the weight of the evidence, not its admissibility.

The court found Ms. Richardson to be a diligent and credible witness. She has worked with Vita Nuova for nearly 20 years, *see* Tr. at 287:21 (Richardson), and as the company's Vice President is undoubtedly familiar with their billing practices. She personally managed the projects at issue, and therefore, was well-positioned to evaluate the extent to which the presence of spent fuel affected each billable activity. The government's position that Ms. Richardson's evaluation required expertise evinces an overly-complicated view of a relatively straightforward task. The court admits Ms. Richardson's testimony as sufficient to carry plaintiff's burden.

Applying Ms. Richardson's percentages to the total invoiced amount for each company, Connecticut Yankee is entitled to recover $49,674 for property transfer costs, and Yankee Atomic is entitled to recover $39,647.

## V.     Legal and Tax Expenses Related to Phase I Damages Award

During the instant claims period, plaintiffs received a large payment from the government pursuant to the judgments in the first round of this litigation. *See* Tr. at 211:9-12 (Pizzella). As a result of that income, plaintiffs incurred legal and tax expenses in an amount of $30,227 that they now seek to recover. Ms. Pizzella testified that, based on her experience with procuring similar services, these expenses are reasonable. *See* Tr. at 214:2-4 (Pizzella). The government does not contest the fact that the costs were incurred, or that they are reasonable, but argues that they should be categorized as legally unrecoverable costs of litigation. *See* Doc. 42 at 45-46.

"It is well settled that in the absence of specific statutory authority, expenses incurred in litigation, whether legal, accounting, secretarial, or other, are not awardable as such." *Kania v. United States*, 650 F.2d 264, 269 (Ct. Cl. 1981) (citations omitted). The costs claimed by plaintiffs, however, were not "incurred in litigation," within the plain meaning of that phrase. Ms. Pizzella testified that upon receipt of "[a]ny large cash stream . . . we have to do a rate filing and a financial analysis to show to FERC our funding needs and our ability to return the money to our wholesale customers." Tr. at 211:17-24 (Pizzella). In addition to expenses related to meeting the regulatory requirements, plaintiffs engaged tax consultants in order to understand the tax implications of receiving such large sums of money. *See* Tr. at 211:25-212:14 (Pizzella). Plaintiffs do not seek to recover on invoices from

their attorneys in the first round of litigation. And the services at issue were not performed in furtherance of plaintiffs' positions related to any round of this litigation.

Furthermore, these costs were foreseeable in the event of the government's breach. Ms. Pizzella testified: "Any fund stream I receive, I have to analyze it from a tax stand point, from a regulatory standpoint. That's what this is. This is, to me, normal business activities [sic] that we undertake." *See* Tr. at 213:7-214:4 (Pizzella). The nature of these expenses, as ordinary and expected in the course of business, demonstrates that the parties should have foreseen them as a consequence of a breach at the time of contracting.

Plaintiffs' are entitled to recover $30,227, divided between the companies as follows: Maine Yankee, $10,500; Connecticut Yankee, $13,727; and Yankee Atomic $6,000.


## CONCLUSION

Based on the foregoing analysis, the court awards the plaintiffs the following damages:

### Yankee Atomic

| | |
|---|---|
| Damages not specifically contested at trial: | $19,595,425 |
| Property transfer costs: | $39,647 |
| Legal and tax expenses: | $6,000 |
| Total recovery: | $19,641,072 |

### Maine Yankee

| | |
|---|---|
| Damages not specifically contested at trial: | $24,430,566 |
| SWEC proceeds: | $142,100 |
| Legal and tax expenses: | $10,500 |
| Total recovery: | $24,583,166 |

**Connecticut Yankee**

| | |
|---|---|
| Damages not specifically contested at trial: | $32,488,348 |
| Property transfer costs: | $49,674 |
| Legal and tax expenses: | $13,727 |
| | |
| Total recovery: | $32,551,749 |

All pending motions are **DENIED** as moot.

The court has filed this opinion under seal in the event that information contained herein remains sensitive.  The parties are directed to submit any proposed redactions within **fourteen days of the date of this opinion.**

The clerk is directed to enter final judgment in favor of Yankee Atomic in an amount of $19,641,072, final judgment in favor of Maine Yankee in an amount of $24,583,166, and final judgment in favor of Connecticut Yankee in an amount of $32,551,749.

**SO ORDERED.**

s/ James F. Merow
James F. Merow
Senior Judge